Filed 1/8/25  P. v. Branson CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F086863 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CRF06-0004987) |
| JAMES WILSON BRANSON, | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from an order of the Superior Court of Mariposa County.  Anita S. Bryant, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Ismah Ahmad, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Poochigian, Acting P. J., Smith, J. and Snauffer, J.

# INTRODUCTION

In 2007, appellant and defendant James Wilson Branson (defendant) was convicted after a jury trial of first degree murder with an enhancement for the personal and intentional discharge of a firearm that proximately caused death. He was sentenced to 50 years to life, and the judgment was affirmed on direct appeal.

In 2022, defendant filed a petition for resentencing pursuant to Penal Code[1] section 1172.6. In 2023, after appointing counsel and conducting a hearing, the trial court denied the petition and found defendant was ineligible for resentencing because he was the actual killer.

On appeal, defendant argues the trial court's denial of his petition was erroneous because the record of conviction from his trial was not before the court, and the court improperly relied on the prosecutor's averments to make a factual finding that he was convicted as the actual killer. As we will explain, we take judicial notice of our own records from defendant's direct appeal, which include the entirety of the instructions given to the jury. We find that any errors committed by the court when it made the prima facie finding are not prejudicial because defendant was ineligible for resentencing as a matter of law, and affirm the court's ruling.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

# FACTS[2]

"On January 21, 2006, defendant contacted his friend of six years, Gregory Ravert, and asked him if he wanted to go to Lester Rairigh's house. Defendant was driving his old pickup truck. Ravert agreed to go. Before they left, they drank some red beers. They then went to the store and bought a 20-pack of beer, some brandy, and some chicken.

"While he was at the store, defendant came in contact with his relative, Angela Morrow. Morrow saw that defendant had a gun in his truck. She asked him if he was going hunting and he responded, 'Something like that.' As Morrow and defendant shared a piece of chicken, defendant pulled out a shotgun shell. He shook it back and forth and smiled. Morrow asked defendant what he was doing and defendant was silent. Morrow had never seen defendant act this way before.

"Defendant and Ravert left the store and returned to defendant's home so Ravert could see the work that defendant had done on his house. They continued drinking and drove to Rairigh's house. While on the way to Rairigh's house, they got out and fired defendant's gun using new .22 ammunition defendant had obtained.

---

**2** During briefing in this case, the People requested this court to take judicial notice of the nonpublished opinion filed in defendant's direct appeal, *People v. Branson* (July 25, 2008, F052512) (*Branson*)), which affirmed the judgment. Defendant objected and argued this court could not rely on the opinion's factual statement to determine whether his petition was properly denied for failing to state a prima facie case.

We grant the People's request and take judicial notice of this court's nonpublished opinion in *Branson*, from which the following factual statement is taken. In so doing, we acknowledge that in reviewing a section 1172.6 petition, the trial court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 406, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*Clements*, at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) We have recited the factual statement from defendant's direct appeal to place his arguments in context, and will not rely on that factual statement to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

"While at Rairigh's house, defendant's demeanor changed.  He got mad and wanted to leave.  Ravert got in the car with him.  Defendant was upset and Ravert could not understand what defendant was saying.  Defendant was driving like a 'wild bull.'  Ravert unloaded the ammunition from the gun.  Defendant was yelling, cussing, and driving ridiculously.  Ravert made defendant stop the truck and let him out.

"On this same day, victim Hibpshman (defendant's half-brother) was working with John Palmer on a piece of land where [a] new [church] was going to be built.  Hibpshman was the pastor of this church.  Defendant had driven by the site sometime during the day and Hibpshman yelled up to him that their work was almost done.  Later that day, after 2[:00] p.m., defendant drove down the narrow road to the site.  Hibpshman said to Palmer, 'That's my brother.  I'm going to go talk to him.'

"Hibpshman walked over and stood next to the driver's door of defendant's pickup.  Shortly thereafter, Palmer walked towards the truck to introduce himself to defendant.  When he approached the truck, he heard defendant say to Hibpshman, 'Why are you always trying to bring the … white man into everything?'  Hibpshman responded, '[W]hy is it all about the Indian with you?'  Defendant was slurring his words, but Palmer could understand what he was saying.  After hearing this, Palmer retreated to Hibpshman's truck, not wanting to interfere with this private conversation.

"As Palmer was drinking some water at the truck, he heard a gunshot and two seconds later he heard another gunshot.  Hibpshman fell to the ground.  Defendant put his truck in reverse and quickly backed up the narrow road.  Palmer rolled Hibpshman over on his left side and left to call emergency personnel.  C.M. lived above the location of the church.  He was outside shooting his pellet gun when he heard an older truck pull up on the dirt road.  He walked down nearer to the church site.  He heard a shot, he then saw a second shot and saw Hibpshman fall backwards.  The truck started backing up 'real quick.'  C.M., who was only 13 years old at the time of the shooting, ran back to his house and barricaded himself inside.

4.

"Emergency personnel arrived at the scene of the shooting. Hibpshman was removed from the scene by ambulance and died later at the hospital. Officers gathered information and obtained a description of defendant's truck. Mariposa County Sheriff Sergeant Mark Jones saw a truck matching the description of defendant's truck sometime after 4[:00] p.m. He followed it, and defendant drove the truck into his driveway and went into his house. Jones notified other units.

"Jones called defendant, and defendant's first remark was, 'How's Ronnie [the victim].' Defendant then said, 'He pulled a gun on me. Ronnie pulled a gun on me.' Although defendant seemed to understand what Jones was saying to him, Jones detected symptoms of intoxication in defendant's voice. Defendant was angry and complained that he had tried to get help from the sheriff before but they would not help him. Defendant ended the telephone call.

"Jones called and spoke to defendant again. Jones tried to get defendant to come out of the house. Defendant refused to come out because he knew the sheriff's officers would shoot him. He said this was the start of the Miwok/White-man war. Defendant said he had figured out a way to handle it, 'by putting a f**king bullet in his head.'

"The standoff continued for several hours. During this time defendant spoke in full sentences. He threatened law enforcement officers outside his home. He said that his guns were loaded and he was ready. Defendant was taken into custody at approximately 9:30 p.m.

"At 12:50 a.m., jail personnel tested defendant twice for the presence of alcohol on his breath; both readings were .00.

"Defendant was interviewed by sheriff's officers at the jail. A tape of this interview was played at trial. The interview began at 7:40 a.m. on January 22, 2006. Defendant was asked to tell the officers what happened the day before with Hibpshman. He said he did not know—it was foggy to him. Defendant said that he saw Hibpshman by the church site. Defendant had a gun with him; he thought it was a shotgun. He had

5.

been drinking a lot and he gets mad and pumped up when he is drinking. Defendant complained that Hibpshman kept the family home after defendant's father died. Defendant was upset that he had to buy the house back from Hibpshman.

"Defendant said that there were a bunch of people working at the church site. Defendant recalled going to the church site. He was upset and had been drinking. Hibpshman came walking towards him and reached for defendant's gun. It went off. Defendant did not remember pulling the trigger. He left and cooled off somewhere, but he could not recall where he went. He said he threw the gun somewhere after the shooting but he did not know where he threw it. When the officers suggested to defendant they would not want the gun to be found by children, defendant replied that he cared about children and that was not going to happen.

"Defendant recalled drinking the day before. He said he carried a gun with him all the time. When asked what happened to his driver's side rear view mirror, he said it had been knocked off earlier in the day. He expressed more than once his inability to recall what happened the day before. He asked the officers how Hibpshman was. The officers told him Hibpshman was dead.

"At the scene of the shooting, officers recovered fragments from defendant's driver's side rear view mirror. Defendant's truck was searched. Officers retrieved ammunition from the truck. Some of the ammunition matched ammunition Ravert gave to officers. There was an almost empty bottle of brandy in the truck as well as beer bottles. Several guns were removed from defendant's home.

"During his testimony, Ravert identified [prosecution] exhibit 53 (the exemplar gun) as a gun just like the gun defendant had in his truck the day of the shooting and the gun that Ravert and defendant used that morning to shoot at squirrels.

"George Luczy, an independent forensics firearms and explosives consultant, looked at different rounds of ammunition. The cartridge removed from defendant's truck and the cartridge retrieved from Ravert were the same type of ammunition. The shot

6.

removed from Hibpshman was consistent with having struck something hard before it entered Hibpshman's body.

"Luczy testified that in order to use the exemplar gun one would have to load it, close it, manually cock it, and pull the trigger. The gun can be shot as a rifle or a shotgun (an 'over-and-under' gun). In order to change from shooting it as a rifle to shooting it as a shotgun, or vice versa, the selector switch had to be manually moved. The gun can be loaded with shotgun shells and .22 ammunition at the same time.

"Another half-brother of defendant, Robert Hibpshman, said that the exemplar gun looked like one of the guns defendant owned.

"Dr. Wilkerson, a pathologist, testified that Hibpshman died from a shotgun wound to the right side of his face and head. There was stippling on his body, which indicated that the gun had been discharged at a close range, approximately four feet. There were small fragments of glass and paint material on Hibpshman's body.

"Neither the gun nor defendant's driver's side rear view mirror was found." (*Branson*, *supra*, F052512.)

## Defense

"Defendant's friend, Robert Beattie, testified that he has known defendant for 20 years. A month or two before Hibpshman's death, Beattie accompanied defendant and Hibpshman on a trip to pick olives. Defendant and Hibpshman acted normally towards each other that day. On another recent occasion defendant came over to Beattie's and got some geese and took them to Hibpshman.

"On the day of the shooting, Beattie was listening to his police scanner. He determined that defendant was a suspect in the shooting of his brother. Beattie called defendant and left a message. Defendant called him back. Defendant was drunk. Beattie asked defendant what was going on and told defendant what he had heard on his police scanner. Defendant asked Beattie a couple of questions and did not seem to know what Beattie was talking about.

7.

"Lester Rairigh testified that he has known defendant for a number of years.  In the early afternoon of January 21, 2006, defendant came to his house with Ravert.  Defendant was driving his pickup truck.  Rairigh testified that it takes approximately 45 minutes to make the seven and one-half mile drive to his house because the road is so rough.  Defendant was drunk when he arrived, as drunk as Rairigh had ever seen him.  Defendant wanted to go deer hunting, but Rairigh said no.  Rairigh's wife testified that defendant appeared to be drunk and was leaning on his truck.  In addition, defendant left a voice mail earlier in the day and he was slurring his speech in the voice mail.

"Jean James testified that she left the house she shared with … defendant at 10[:00] a.m. on January 21, 2006.  Defendant had already left the house when she left.  James said she had never heard defendant speak 'ill' of … Hibpshman ….

"Defendant's daughter spoke to him the evening of January 20, 2006.  Defendant did not say anything negative about Hibpshman during their conversation.

"Christopher Kohn was in Mariposa for a bike ride on January 21, 2006.  Kohn had stopped when defendant drove by in his pickup truck.  Defendant said hello and asked Kohn if he had any beer.  Kohn thought defendant was acting strangely and was obviously drunk.  Kohn left.

"Defendant testified on his own behalf.  Defendant testified that he is a Native American.  He lives in the house he was born in.  At one point in time, Hibpshman moved into the house to take care of defendant's father.  When the father died, Hibpshman remained in the house.  Hibpshman was going to sell the house and this disturbed defendant.  They had a family discussion and defendant bought the house from Hibpshman.  Defendant let his sister live in the house, but she trashed it.  Defendant reclaimed the house and moved back in with his girlfriend, Jean.

"On January 21, 2006, defendant began drinking at 8[:00] a.m.  He then got Ravert and they purchased a 20-pack of beer and bottle of brandy.  They returned to defendant's house where he drank more, including some whiskey.  Defendant remembered going to

8.

Rairigh's house, but did not remember much after that. He had a gun with him—a 20-gauge 'over and under.'

"Defendant remembered that Hibpshman came to his truck and they were talking about Indians and White people. Their argument got heated. Defendant started to show Hibpshman his gun. He stuck it out of the window of his truck and it went off. Hibpshman grabbed the gun and it went off again.

"Defendant left. He was shaking and nervous. He could not remember doing anything with the gun or the mirror from his truck. He remembered going back to his house and calling Beattie. He remembered talking to Sergeant Jones and refusing to come outside because he was scared.

"Defendant detailed a life of heavy drinking beginning at age 12. He also takes several medications for health problems including diabetes and high blood pressure. He was told not to mix alcohol with his medications.

"Defendant did not want Hibpshman to die and did not intend for him to die. He testified that if he had something to do with Hibpshman's death he was very sorry.

"Melvin Beckwith, a certified substance abuse professional testified as an expert. He reviewed the case file and talked to defendant for two hours. It was his conclusion that defendant is an alcoholic.

"Beckwith testified that alcohol impairs the brain. A person drinking alcohol may have alcohol-induced amnesia, a.k.a. a blackout. These can be of two types. One is fragmentary where the individual cannot recall bits and pieces of events and the other is a complete blackout where the individual has no recall. Some people can function during a blackout but have no recollection of what they do. Beckwith also testified that people's tolerance can change. Alcoholics can drink more and more without showing the effects, but at some point their tolerance decreases and they consume less to reach the same level of impairment. It was his opinion that defendant was a late-stage alcoholic in the severe range. Thus, the effects of the alcohol would hit him faster. If defendant was impaired,

he would not be able to make a connection between what he should not do and his behavior.

"Based on defendant's zero alcohol reading at 1[:00] a.m. on January 22, 2006, it was Beckwith's opinion that if defendant stopped drinking at approximately 2[:00] p.m., but had been drinking prior to this, the highest his blood alcohol level could have been at 2[:00] p.m. would have been in the range of .175–.24 percent." (*Branson*, *supra*, F052512.)

**Rebuttal**

"Michael Don Shore, a licensed psychologist, testified that during an alcohol-induced blackout individuals do not remember their actions and decisions. Their memory and decisions can be faulty. To evaluate individuals' mental decisions, one does not look at their memories because the memories are gone. One looks to the individuals' actions at the time to see if their actions were purposeful and if their actions indicate they were able to make choices. To evaluate them, one would look to see if they were acting with deliberation and care at the time they were in a blackout.

"Luczy[, the prosecution's firearms expert,] testified that there is no way to accidentally discharge the exemplar gun without pulling the trigger. Everything on this type of gun has to be done manually. After the gun is fired, the entire cycle has to be repeated manually before the gun can be fired again." (*Branson*, *supra*, F052512.)

## PROCEDURAL BACKGROUND

On April 20, 2006, an information was filed in the Superior Court of Mariposa County charging defendant with count 1, murder of Hibpshman (§ 187, subd. (a)), with enhancements that he personally and intentionally discharged a firearm, a shotgun, which proximately caused the victim's death (§ 12022.53, subd. (d)), and he personally used a firearm (§ 12022.5, subd. (a)).

Defendant was represented at trial by appointed counsel, Michael Fagalde.

10.

## Jury Instructions[3]

The court gave CALCRIM No. 500 on the general principles of homicide, and excusable and justifiable homicide.

CALCRIM No. 510 defined excusable homicide and stated that defendant was not guilty of murder or manslaughter if he killed someone as a result of accident or misfortune.

The jury was instructed with CALCRIM No. 520, which defined the elements of murder, intent, and express and implied malice. CALCRIM No. 521 stated defendant was being prosecuted for first degree murder under two theories: (1) the murder was willful, deliberate, and premeditated; and (2) the murder was "committed by shooting a firearm from a motor vehicle."

CALCRIM No. 521 defined deliberation, premeditation, and willfulness for the first degree murder.

CALCRIM No. 521 defined the second theory of first degree murder as follows:

"The defendant is guilty of first degree murder if the People have proved that the defendant murdered by shooting a firearm from a motor vehicle. The defendant committed this kind of murder if:

"One, he shot a firearm from a motor vehicle.

"Two, he intentionally shot at a person who was outside the vehicle.

"And, three, he intended to kill that person."

CALCRIM No. 521 stated all other murders were of the second degree.

CALCRIM No. 522 defined provocation, that it may reduce a murder from first to second degree, and reduce murder to manslaughter. CALCRIM No. 570 defined voluntary manslaughter based on sudden quarrel or heat of passion and CALCRIM

---

**3**      As will be explained in section III, *post*, this court takes judicial notice of the entirety of the records before this court in defendant's direct appeal, *Branson*, *supra*, F052512, particularly the jury instructions.

No. 580 defined involuntary manslaughter based on criminal negligence. CALCRIM Nos. 625 and 626 defined voluntary intoxication and its application to the charged and lesser offenses.

CALCRIM No. 3146 defined the section 12022.5, subdivision (a) enhancement, as to whether defendant personally used a firearm in the commission or attempted commission of the offense. CALCRIM No. 3149 defined the section 12022.53, subdivision (d) enhancement as follows:

> "If you find the defendant guilty of murder in the first or second degree, you must then decide whether the People have proved the additional allegation that the defendant personally and intentionally discharged the firearm during that crime causing death. To prove this allegation, the People must prove that:

> "One, the defendant personally discharged a firearm during the commission or attempted commission of that crime.

> "Two, the defendant intended to discharge the firearm.

> "And, three, the defendant's act caused the death of a person."

The jury was not instructed on principals and accomplices, aiders and abettors, direct or indirect aiding and abetting, the natural and probable consequences doctrine, target or nontarget offenses (CALCRIM Nos. 400–403), the felony-murder rule (CALCRIM No. 540A), or any other theory of imputed malice.[4]

---

**4**    In closing argument, the prosecutor argued defendant was the shooter, the evidence did not support the defense claims of an accidental shooting or manslaughter, and the evidence instead established first degree murder. The prosecutor acknowledged defendant might have been drunk but the evidence showed he was still able to form the intent to kill.

Defense counsel argued defendant was drunk, the shooting was an accident, and he did not intend to kill the victim. Counsel asserted the prosecutor failed to prove premeditation or an intent to kill, and defendant had no motive to kill his half-brother. Counsel argued either defendant was not guilty because the shooting was an accident, or only guilty of involuntary manslaughter because he was heavily intoxicated.

**Verdict and Sentence**

On February 8, 2007, the jury found defendant guilty of first degree murder and found both the enhancements true: that defendant personally used a firearm, and he personally and intentionally discharged a firearm that caused death or great bodily injury.

On March 8, 2007, defendant was sentenced to 25 years to life for first degree murder, plus a consecutive term of 25 years to life for the section 12022.53, subdivision (d) enhancement; the court stayed the term for the section 12022.5 enhancement.

**Direct Appeal**

On appeal, defendant argued the trial court erroneously precluded testimony from a defense expert about the effect of alcohol on Native Americans, and the court should have stricken the personal use enhancement instead of merely staying the term. This court rejected both arguments and affirmed the judgment. (*Branson*, *supra*, F052512.)

**PETITION FOR RESENTENCING**

On October 17, 2022, defendant filed, in propria persona, a petition for resentencing pursuant to section 1172.6 and requested appointment of counsel.

Defendant filed a supporting declaration stating (1) he was eligible for resentencing because a complaint, information, or indictment was filed that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine, or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine; (2) he was convicted of murder following a trial; and (3) he could not presently be convicted of murder because of changes made to sections 188 and 189, effective January 1, 2019.

Defendant further asserted he was entitled to a hearing where he could introduce evidence not presented at trial based on "facts" established at the preliminary hearing, such as "veteran PTSD, preexisting mental deficiencies; prohibited conduct that would

13.

diminish culpability in regards to mental state of intent, knowledge, premeditation, [and] reckless indifference to human life." Defendant requested "a briefing to support claims."

On November 29, 2022, the court appointed Eugene Action to represent defendant.

**The Trial Court's Initial Hearing**

On January 31, 2023, the trial court conducted an initial hearing on defendant's petition. Defendant was not present but represented by Action, his appointed counsel. The court stated that it had not arranged for defendant's presence because it intended to set a briefing schedule.

The prosecutor stated the parties would not need to file briefs because defendant was convicted of murder "by shooting someone in the face deliberately with a shotgun from three feet away," and the felony-murder rule did not apply.

Defendant's counsel agreed that defendant's conviction was not based on felony murder, and it was a "direct murder, a personal use of a shotgun to the face of someone, murder [one]." Defense counsel continued:

> "So unless [defendant] can inform me if he wants to contact me, we can address it again. If there's something else he's arguing, looking at the back of the things he's arguing for, we don't have diminished capacity. That's what he's talking about. He's talking about PTSD. He had a jury trial, your Honor. So those remedies would not have been mitigating on a 25-to-life-plus sentence. So I don't know what to say."

The trial court asked the parties whether they wanted to submit on the petition "that [defendant] has not made a prima facie showing to proceed in this matter." The prosecutor submitted. Defense counsel replied:

> "And I hesitate just to have the petition dismissed, your Honor. I would suggest that maybe we give it sometime [*sic*] for [defendant] to inform me [of] exactly what I'm missing here. If there's something, he should be able to talk to me and say, 'Here's what it is.' And once I have talked to him, if he hasn't swayed me that there's something more in this— so I would suggest that we go out one more time. If somehow, somebody can put me in contact with him, I don't even know where he's at right now."

The trial court continued the matter.

**The Trial Court's Continued Hearing**

On August 14, 2023, the trial court convened the hearing on the prima facie issue. Defendant appeared from prison remotely, and his counsel was in court.

Defense counsel stated:

"I'm not sure how voluminous the record is. *I don't have anything on [defendant] except his petition.* This is about him making a prima facie showing about revisiting and resentencing. I think he's made some points. I'm just not sure where this stands. It speaks for itself. He's saying, essentially, based on the new law, felony murder is not punishable by the same thing. If the Court agrees or disagrees, if we think he made the showing, we're just here to find out." (Italics added.)

The prosecutor stated that defendant's conviction for first degree murder did not involve the felony-murder rule, and he was ineligible for relief under section 1172.6 because defendant directly shot the victim.

Defense counsel replied:

"[The prosecutor] obviously has some idea what this was about, what the theory was. I have got nothing. So I don't have anything. So if what [the prosecutor] is saying is accurate, then I understand his position. However, I don't know what he was convicted of. Even if he was convicted of a certain charge and it turns out it was felony murder instead, where [the prosecutor] just said it was personal use of a firearm, and that's what they found, I just don't know this. And so whether the felony murder rule applies or not, if it was personal use of the firearm versus somebody had killed him while he was there, and somebody else had a gun, and we got a felony murder situation, I just don't know the facts. [¶] So without that, I couldn't say anything. And [the prosecutor] makes a good point of what he's saying is accurate, and I understand. But how are we going to know that if we can't argue that information? So briefing isn't going to do us any good if I don't even have a file."

The prosecutor said that his office provided discovery to the defense, including "the April [20], 2006 files, and the information, which occurred after [the] preliminary

15.

hearing in the case, where we alleged that [defendant] was guilty of first degree murder for felony—as a felony, not as felony murder."[5]

Defense counsel stated:

> "I'm looking through my files. I don't have it. And I'm not even going to say that the [prosecution] didn't give it to me. I don't have it. I don't know why I don't have it, but I don't have it. And that said, I don't want to get it from the [prosecution], your Honor, I want to get it from the Court. If the Court appoints me, then the Court needs to provide that. And I'm not blaming anybody. I'm saying that's where I'm at right now in this case. And so I need that, and I would like somebody to supply that for me as to what happened."

The trial court advised defense counsel that the file showed defendant was convicted of first degree murder, with an enhancement for personally and intentionally discharging a firearm that proximately caused death, and asked if that was sufficient information for him. Defense counsel replied that if the court was taking judicial notice of the verdict, with "personal use of a firearm, first degree murder," then that did not fit within the felony-murder rule.

The trial court asked the prosecutor if it had accurately described defendant's conviction. The prosecutor said yes.

### *The Trial Court's Denial of the Petition*

The trial court took judicial notice of its own records and stated it had reviewed them.

The trial court stated it complied with section 1172.6 by appointing counsel, conducting a hearing on the petition, and allowing the parties the opportunity to submit briefing. The court noted that at the initial hearing to set a briefing schedule, the prosecutor moved to dismiss the petition but the court granted defense counsel's request for a continuance. The court found there had been sufficient time for briefing.

---

[5] The information that charged defendant with murder was filed on April 20, 2006.

16.

The trial court held defendant was ineligible for resentencing as a matter of law and his petition failed to state a prima facie case, because "there is no factual dispute that [d]efendant was the actual killer" and he "was convicted of first degree murder[; he] was the actual killer." The court said it had reviewed defendant's file, took judicial notice of the contents of that file, held there were no changes in the law that applied to defendant's conviction, and denied the petition.

Defense counsel raised an objection:

"Only one objection, your Honor. Time for briefing. If I didn't receive the Court's file or any of the information, then I'm just going to make sure that I make the record clear on that. I don't think there was time for briefing in what was insufficiently provided in the information that I needed. However, I do recognize what the Court said, based on the convictions. It does make sense. I don't think the felony murder rule applies in this instance. But that's what the Court said, as well."

The trial court asked the parties if they had any further comments, and they said no. The court advised defendant that his petition was denied. Defendant personally addressed the court and asked why. The court said it already explained why he was not eligible. Defendant said that he had not even spoken to his attorney.

"[DEFENDANT]: I don't understand you, anyway, because the whole thing was a made up story of the whole Court and everything. Judge—he's a judge now. He was my appointed lawyer then, Mr. Fagalde. And Mr. Fagalde did not do anything for me. He was trying to be a judge. And I take it very hard, because it hurts me because that was my brother that got shot, and it was an accidental shooting, what they said in court—

"THE COURT: Okay.

"[DEFENDANT]: And it was all a farce for.

"THE COURT: [A]nd that's why the Court, why I heard this matter, because … Judge Fagalde is disqualified, since he was involved in that, and I have reviewed this petition. And as far as this petition, I'm finding it doesn't meet the qualifications. So if you have any other questions, I would recommend that you talk to your attorney. That's all I can do today.

17.

"[DEFENDANT]:  This guy here … he can't even answer his phone.

"THE COURT:  Okay.

"[DEFENDANT]:  But Fagalde, I'd like to file a suit against Fagalde for doing what he did.  And I don't know who to talk to.

"THE COURT:  And I'm just dealing with this petition today .…  So thank you for being present and thank you to the prison for making you available.

"[DEFENDANT]:  He can kiss my ass.

"THE COURT:  Okay.  Thank you."

On September 12, 2023, defendant filed a notice of appeal.

## DISCUSSION

### I.  Section 1172.6

We begin with the relevant statutes and amendments.  Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) became effective in 2019, and "altered the substantive law of murder in two areas.  First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e) .…  Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) *The person was the actual killer.*  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*), italics added.)

"Second, Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder.  [Citation.]  'Malice shall not be imputed to a person based solely on his or her

18.

participation in a crime.' [Citation.]  One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine.  [Citation.]  '[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the "natural and probable consequence" of the crime the accomplice aided and abetted (i.e., the nontarget offense).  [Citation.]  A nontarget offense is the natural and probable consequence of a target offense "if, judged objectively, the [nontarget] offense was reasonably foreseeable."  [Citation.]  The accomplice need not actually foresee the nontarget offense.  "Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " '  [Citation.]  Thus, under prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault.  [Citation.]  The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime.  [Citation.]  Senate Bill 1437 ended this form of liability for murder." (*Curiel*, *supra*, 15 Cal.5th at p. 449.)

"Senate Bill [1437] also added … former section 1170.95, now renumbered as section 1172.6.  This created a procedural mechanism for those convicted under the former law to seek retroactive relief." (*People v. Reyes* (2023) 97 Cal.App.5th 292, 295; *Curiel*, *supra*, 15 Cal.5th at p. 449.)

### *The Prima Facie Determination*

When a petition for resentencing is filed, the trial court shall appoint counsel if requested by petitioner.  (§ 1172.6, subd. (b)(3).)  After counsel is appointed and the parties have had an opportunity to submit briefing, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief.  If the petitioner

19.

makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1172.6, subd. (c).)

In making the prima facie determination, a petitioner is ineligible for resentencing "as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations," that the petitioner could still be convicted after the amendments to sections 188 and 189. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

The record of conviction includes the charging documents, jury instructions, closing arguments, and verdicts. (*People v. Harden* (2022) 81 Cal.App.5th 45, 50, 54–55; *People v. Flores* (2023) 96 Cal.App.5th 1164, 1170; *People v. Lopez*, *supra*, 78 Cal.App.5th 1, 13–14; *People v. Jenkins* (2021) 70 Cal.App.5th 924, 935.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However … , the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] [T]he 'prima facie bar was intentionally and correctly set very low.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

Even after the amendments to sections 188 and 189, however, it is settled that relief under section 1172.6 is not available if the defendant was the actual killer. (*People v. Strong* (2022) 13 Cal.5th 698, 710; *People v. Cody* (2023) 92 Cal.App.5th 87, 105; *People v. Basler* (2022) 80 Cal.App.5th 46, 54.)

" 'If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the

defendant has made a prima facie showing of entitlement to relief, "the court shall issue an order to show cause." [Citation.]' " (*Curiel*, *supra*, 15 Cal.5th at p. 450.)

### ***Standard of Review***

The trial court's denial of a section 1172.6 petition for failing to state a prima facie case is reviewed de novo. (*People v. Bratton* (2023) 95 Cal.App.5th 1100, 1113.) To demonstrate prejudice from statutory errors in the court's denial of the petition before issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at p. 974; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II. The Parties' Initial Arguments

In his opening brief on appeal, defendant argued the matter must be remanded because at the hearing on his section 1172.6 petition, defense counsel was not provided with discovery of the trial record, and that prevented him from filing briefing and addressing the prima facie issue. Defendant argued the jury instructions were not before the trial court at the section 1172.6 hearing, and the instructions were not augmented to the instant appellate record. Defendant noted the record before this court only contained the prosecutor's list of requested "CALJIC" instructions presented to the court during his trial, and that list "apparently" included "CALJIC No. 3.02" which, at the time of defendant's trial, defined the now-abolished natural and probable consequences doctrine.

Defendant asserted the trial court improperly made factual findings to deny the petition by relying on the prosecutor's statements that defendant was convicted as the actual killer and not under the felony-murder rule. Defendant argued there was no evidence in the current record to show what instructions were given to the jury, or conclusively demonstrate he was ineligible for resentencing as a matter of law. The record instead suggested the jury may have relied on "CALJIC No. 3.02" defining the natural and probable consequences doctrine to convict him of murder. Given "such

21.

uncertain circumstances, where the record does not support the conclusions of the prosecutor or the trial court, this court should reverse the trial court's finding that no prima facie case existed, and instead remand the case for an order to show cause and an evidentiary hearing …."

The People replied by asking this court to take judicial notice of our nonpublished opinion in defendant's direct appeal that affirmed the judgment, because that opinion was part of the record of conviction and showed that defendant was tried and convicted as the actual killer. The People further asserted that the prosecutor's request for jury instructions showed that CALCRIM instructions were given, and the request did not include any pattern instructions on felony murder or the natural and probable consequences theory.

In his reply brief, defendant objected to this court taking judicial notice of our nonpublished opinion from his direct appeal. Defendant asserted there was no way to determine what instructions were given to the jury because the appellate record only included the prosecutor's list of requested instructions, and the instructions given to the jury are not in the record.

### III. Judicial Notice

Defendant is correct that the appellate record as initially constituted did not contain the prosecutor's list of requested instructions or the actual instructions given at trial.

As explained above, we grant the People's motion to take judicial notice of our nonpublished opinion from defendant's direct appeal that affirmed the judgment. As also explained, we have not relied on the factual statement from our prior opinion to resolve the prima facie issues raised in this appeal. (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 292; *Lewis*, *supra*, 11 Cal.5th at p. 972.)

The People did not request this court to take judicial notice of the entirety of the record from defendant's direct appeal. In order to clarify the record, this court filed an

22.

order advising the parties that we were considering taking judicial notice of the entirety of the records before this court in *Branson*, *supra*, F052512, particularly the jury instructions. We ordered these records immediately transmitted electronically to the parties, and stated that if a party did not object, this court would consider the lack of a response as indicating the party did not oppose judicial notice. Our order further stated that "each party may advise this court if leave will be requested to file supplemental briefing on the impact, if any, of these records on the issues raised in the instant appeal. If leave is requested, this court will file a separate order setting a briefing schedule."

### ***Defendant's Objection***

Defendant filed an objection and argued this court could not take judicial notice of our records from defendant's direct appeal because the trial court and the prosecutor "failed to ensure that trial counsel had access to the trial file," and they failed "to make the trial file or any jury instructions therein part of the record on appeal." Defendant asserted that under such circumstances, it appeared unfair "to create the record on appeal rather than in the trial court."

Defendant did not request to file supplemental briefing to address the trial records. The People did not respond or file an objection to our order.

### ***Analysis***

Defendant's objection to this court taking judicial notice of our own records from his direct appeal is based on the proposition that appellate courts generally do not take judicial notice of evidence not presented to the trial court. (See, e.g., *People v. Preslie* (1977) 70 Cal.App.3d 486, 493.)

However, appellate courts routinely take judicial notice of the records of their own cases under Evidence Code sections 452, subdivision (d) and 459. (See, e.g., *Rel v. Pacific Bell Mobile Services* (2019) 33 Cal.App.5th 882, 886 ["On our own motion, we take judicial notice of [two prior opinions in same case] as well as the underlying appellate records. (See Evid. Code, § 452, subd. (d).)"]; *People v. Bilbrey* (2018) 25

23.

Cal.App.5th 764, 769, fn. 7 [taking judicial notice of related appeal in writ proceeding]; *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 426, fn. 1 ["We take judicial notice of the record on appeal filed in this court in [prior appeal in same case], as well as of this court's unpublished opinion in that matter. (Evid. Code, §§ 451, subd. (a), 452, subd. (d), 459, subd. (a).)"].)

As explained above, in determining whether a petitioner made a prima facie case for resentencing, the court may review the record of conviction from the petitioner's case, that allows the court "to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with the statute's overall purpose: to ensure that … culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process." (*Lewis*, *supra*, 11 Cal.5th at pp. 971–972, & fn. 6.)

Where the trial court erroneously denies a petition for resentencing without issuing an order to show cause, the question for the reviewing court is whether the court's error was prejudicial under *Watson*, and whether it is reasonably probable that, absent the error, his petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974.) This standard applies even if the defendant's right to counsel under section 1172.6 was violated. (*Lewis*, at p. 972; *People v. Delgadillo* (2022) 14 Cal.5th 216, 227; *People v. Hurtado* (2023) 89 Cal.App.5th 887, 893.)

At the section 1172.6 hearing, defense counsel complained that he had not received any discovery; the prosecutor replied that discovery had been provided to the defense and the record of conviction showed defendant was tried and convicted as the actual killer.

The trial court took judicial notice of its own records and stated it had reviewed them, and denied the petition because there was "no factual dispute" that defendant was

the actual killer. However, the court did not clarify exactly what records were being reviewed in order to make that finding.

To the extent the trial court erroneously made the prima facie finding over defense counsel's objections, or made factual findings based on the prosecutor's averments about the nature of defendant's conviction, we must review the entirety of the record of conviction to determine whether it is reasonably probable that, absent the error, his petition would not have been denied for failing to state a prima facie case.

Accordingly, we take judicial notice of our own records from defendant's direct appeal, which includes the entirety of the instructions given at his trial, to determine whether the court's denial of the petition constituted prejudicial error under *Watson*. (Evid. Code, §§ 450, 452, subd. (d), & 459.)

## IV.  The Record of Conviction

The augmented record on appeal includes the prosecution's request for "Judicial Council of California Criminal Jury Instructions," commonly known as "CALCRIM" instructions. (See, e.g., *People v. Ramirez* (2021) 10 Cal.5th 983, 1008, fn. 5.) "The California Judicial Council withdrew its endorsement of the long-used CALJIC instructions and adopted the new CALCRIM instructions, effective January 1, 2006." (*People v. Thomas* (2007) 150 Cal.App.4th 461, 465.)

The prosecutor's requests included "500, 520, 521, [and] 570," consistent with the numbering sequence for CALCRIM instructions defining homicide, first and second degree murder, and voluntary manslaughter. Contrary to defendant's assertions, the prosecution's request did not list "CALJIC No. 3.02." Instead, the prosecutor's request included "300, 301, [and] 302," consistent with the numbering sequence for "CALCRIM" instructions on evidence. CALCRIM Nos. 400–403, defining aiding and abetting and the natural and probable consequences doctrine, and CALCRIM No. 540, on the felony-murder rule, were not on the prosecution's list.

25.

The clerk's transcript from defendant's trial, of which we have taken judicial notice, contains defense counsel's request for "Judicial Counsel of California Criminal Jury Instructions," again referring to the "CALCRIM" instructions. The list included "500, 510, 520, 521, 522, 570, 571, 580, 625, [and] 626," consistent with the numbering sequence for CALCRIM instructions for homicide, excusable homicide based on accident, first and second degree murder, premeditation, provocation, voluntary and involuntary manslaughter, and voluntary intoxication.

The reporter's transcript from defendant's trial, of which we have also taken judicial notice, includes the entirety of the jury instructions as read by the trial court. The transcript shows the court gave CALCRIM and not CALJIC instructions. As set forth above, the jury was instructed on first and second degree murder, intent to kill, express and implied malice, and premeditation, deliberation, and willfulness. The jury was also instructed on the alternate theory of first degree murder, of a murder "committed by shooting a firearm from a motor vehicle"—that defendant committed "this type of murder" if "*he* shot a firearm from a motor vehicle," he intentionally shot at a person who was outside the vehicle, and "he *intended* to kill that person." (CALCRIM No. 521, italics added.)

The jury was instructed on excusable or justifiable homicide, accident, provocation, voluntary and involuntary manslaughter, and voluntary intoxication.

The trial court did not instruct the jury on principals and accomplices, aiders and abettors, or direct or indirect aiding and abetting. Contrary to defendant's supposition, the court did not instruct on accomplices, aiding and abetting, the natural and probable consequences doctrine, or target and nontarget offenses, as stated in CALCRIM Nos. 400–403 or CALJIC No. 3.02. The court did not instruct on the felony-murder rule in CALCRIM No. 540, or any other theory of imputed malice that is now invalid after the amendments to sections 188 and 189.

We thus conclude that to the extent the trial court erroneously overruled defense counsel's objections at the prima facie hearing, and improperly made factual findings about the nature of defendant's murder conviction to deny the petition without issuing an order to show cause, the error is not prejudicial because the record of conviction, consisting of the jury instructions, shows defendant was convicted of first degree murder as the actual killer and ineligible for resentencing as a matter of law.

## DISPOSITION

The trial court's order of August 14, 2023, denying defendant's section 1172.6 petition for resentencing, is affirmed.